An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of A p p e l l a t e   P r o c e d u r e .

NO. COA13-1196
NORTH CAROLINA COURT OF APPEALS

Filed:  20 May 2014

RANDI LEIGH ROBERSON,
        Plaintiff,

    v.                                  Vance County
                                        No. 12 CVD 809
RUSSELL DAVID ROBERSON,
        Defendant.

_____

MARLINA LYNETTE ROBERSON,
        Plaintiff,

    v.                                  Vance County
                                        No. 12 CVD 1019
RUSSELL DAVID ROBERSON,
        Defendant.


Appeal by defendant from orders entered 5 April 2013 by Judge John W. Davis in Vance County District Court.  Heard in the Court of Appeals 17 February 2014.


*Legal Aid of North Carolina, Inc., by Dietrich D. McMillan, Jason Langberg, Aaron J. Rogers, Celia Pistolis, and Gina Reyman, for plaintiff-appellee Randi Leigh Roberson.*

*Melissa C. Lemmond, for plaintiff-appellee Marlina Lynette Roberson.*

*Stainback, Satterwhite & Zollicoffer, PLLC, by Paul J.*

*Stainback, for defendant-appellant.*

MARTIN, Chief Judge.

Defendant Russell David Roberson appeals from domestic violence orders of protection, forbidding acts or threats of domestic violence to, and contact with, his daughter, plaintiff Randi Leigh Roberson ("Randi"), and his wife, plaintiff Marlina Lynette Roberson ("Mrs. Roberson"). We affirm.

The evidence presented at the hearing tended to show that defendant and Mrs. Roberson were twice married to each other, and that three children were born to their first marriage; two daughters and a son. Randi is their eldest child; seventeen on the date of the events giving rise to this action. On the morning of 10 August 2012, just before 9:00 a.m., defendant, Randi, and the other children were in the family residence in Henderson, North Carolina, while Mrs. Roberson was at work about an hour away. When Randi descended the stairs, defendant asked her for the keys to the van that Randi drove to and from work, which vehicle was registered in Mrs. Roberson's name, so that defendant could move the van into the yard. In response to his request, Randi gave defendant her key ring, which included the key to the van. Defendant walked out of the house, moved the vehicle, came back into the house, and returned the key ring to

Randi, who put it in her pocket. Then, moments later, defendant demanded that Randi take the key for the van off of the key ring and give it back to him. According to Randi's testimony, when she refused, defendant said, "We can do this the easy way or we can do this the hard way. I will slam you down right here and take that key." Randi then said that defendant "proceeded to grab [her around her neck] in a choke hold [from behind]," during which time she "couldn't breathe," "felt restrained," and "was scared that he was gonna hurt [her]." In an attempt to try to "get free any way [she] could," Randi said she tried to bite defendant's arm, but was only able to bite her own lip. When she was finally able to "get free" from defendant's hold around her neck, Randi ran past her twelve-year-old brother, who had been standing in the kitchen throughout the altercation, and ran down the hallway into the garage. Randi testified, without objection, that, after she ran from the kitchen, her brother "was yelling out behind [her] to—asking [her] dad to stop."

Defendant gave chase and "caught [Randi's] shirt" as she entered the garage. Defendant then "got [her] in a choke hold again up against [their] air hockey table." After "struggl[ing] there for a while," defendant "slammed [her face] down against the freezer" and grabbed the key ring out of her pocket, at which point Randi ran outside, jumped the fence into her

neighbor's yard, and called both 9-1-1 and her mother. Randi testified that her eye was bruised as a result of defendant "slam[ing]" her face against the freezer.

Mrs. Roberson testified that, upon receiving a "frantic, upset" phone call from her twelve-year-old son, she immediately jumped into her car and left work to drive home. Mrs. Roberson then testified, without objection, that she called Randi and asked her where she was, to which Randi replied that she was outside in the yard at the neighbor's house. When Mrs. Roberson asked if Randi was okay, Randi started crying and recounted to Mrs. Roberson that defendant "had choked her and that——had slammed her down on the ground in the——down on the floor in the garage and had hit her face on the refrigerator, and that, she finally got away from him and she called 9-1-1, and the police was [sic] on the way." When Mrs. Roberson arrived at the family residence, she saw that Randi "had a really red, splotchy eye" that "had started to bruise," and "she was complaining of a swollen neck, and it was swollen, no marks on the neck, but it was swollen."

Mrs. Roberson also testified, without objection, that, several years prior to this incident, defendant had "harmed [Mrs. Roberson] before," where "[h]e bit [her] and threw [her] to the ground, bruising [her] from head to toe." Mrs. Roberson

further testified that her relationship with defendant was

> an emotional, mental struggle all the time, and he has to be right, he has to⸺he has to have everything his way and such control, he's got to make sure [the family] do[es] what he says, move where he says, go where he says, and not go where he says . . . . [H]e escalates emotionally, and he becomes verbally abusive and now, physically.

Mrs. Roberson also said that after the first year of their second marriage to each other, "it started again, and that's why [she's] worried, and that's why [she's] afraid, and that's why [she's] scared because it's going down the same path . . . the same path, the same controlling behavior, the same emotional and mental control." She said that, during their second marriage, defendant "started controlling where [she] could go. . . . [They] were never to go to anybody else's holiday, you know, parties or anything. It just⸺it was a control thing. It was an emotional thing." "If [defendant] couldn't [make her] do something then it was just like hounding [her] constantly making [her] feel worthless, laughing at [her] just, you know, making [her] feel like⸺belittled, in which [sic] he's done this entire time." Mrs. Roberson also said, without objection, that her children "tell [her] that they were afraid of [defendant]," which was corroborated by Randi's own testimony that she is afraid of defendant because she "never know[s] what the punishment will be" and because she is "afraid that if

[defendant] comes back" to the family residence, a punishment like the one she suffered during the incident at issue, "where he——he slammed [her] and choked [her] and all this," "will happen again and he will try to take out revenge on [her]." Additionally, when asked whether defendant ever threatened Mrs. Roberson with a firearm, Mrs. Roberson testified that, "[l]ong ago," when she tried to leave with Randi when she was very small, defendant "put his finger up to [her] head and said, 'I will do that if you ever try to take her.'"

Defendant testified on his own behalf that, on the morning of 10 August 2012, after repeatedly asking Randi for her key ring and being met only with her refusals to comply with his request, defendant "reached for the keys to grab the keys out of her pocket." Defendant said that, as he reached for the keys, Randi "leaned over and started plowing toward [him]" and "knocked [him] backwards." Defendant said that it was at this point, as he was "trying to catch [him]self," that his "hand went around back of her and just grabbed her trying to stand up." Defendant said then that Randi "took off down——down the hallway," and that he followed behind her as she ran away from him. According to defendant, as Randi was running away from him and he was following closely behind her, Randi tripped over a pile of dirty clothes and started falling, but, "to keep her

from falling, . . . [he] hit her in the back and she must've bruised her eye on the way down in her fall." He then testified that, as she was falling, he "grabbed her to brace her, and she immediately started biting [his] arm" and bit him for "approximately a couple of minutes there." Defendant then said that he "immediately pulled [his] arm back out" when Randi started coughing, then reached around and "grabbed the key out of her pocket," which is when Randi "hollered 9-1-1" and ran to the neighbor's house. Defendant said he then walked down to the boat dock at the back of the family residence, waited about fifteen minutes, and then walked back to the residence, where he was met by law enforcement officers and was placed under arrest.

Randi and Mrs. Roberson each filed a complaint and motion for a domestic violence protective order ("DVPO") against defendant, alleging that defendant "has attempted to cause or has intentionally caused me bodily injury [or has caused bodily injury to the children living with me]," or "has placed me or a member of my family or household in fear of imminent serious bodily injury or in fear of continued harassment that rises to such a level as to inflict substantial emotional distress." Both complaints requested, in part, that the court order the eviction of defendant from the family residence. The court entered ex parte domestic violence orders of protection against

defendant as to both complaints. Defendant filed answers with respect to both complaints requesting that the matters be dismissed. After numerous continuances, the matters were consolidated for hearing and heard on 2 April 2013. Defendant moved to dismiss both cases at the close of the complainants' evidence, which motions were denied. On 5 April 2013, the trial court entered domestic violence orders of protection against defendant in which it concluded, in part, that defendant committed acts of domestic violence against Randi and against the minor child residing with Mrs. Roberson, and ordered that defendant stay away from the parties' residence. Defendant appeals from both orders.

_____

"[W]hen the trial court sits without a jury, the standard of review on appeal [for a DVPO] is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts." *Burress v. Burress*, 195 N.C. App. 447, 449, 672 S.E.2d 732, 734 (2009) (first alteration in original) (internal quotation marks omitted). Because "the trial judge is present for the full sensual effect of the spoken word, with the nuances of meaning revealed in pitch, mimicry and gestures, appearances and postures, shrillness and stridency, calmness and composure,

all of which add to or detract from the force of spoken words," *Brandon v. Brandon*, 132 N.C. App. 646, 651, 513 S.E.2d 589, 593 (1999) (internal quotation marks omitted), "[w]here the trial court sits as the finder of fact, and where different reasonable inferences can be drawn from the evidence, the determination of which reasonable inferences shall be drawn is for the trial [court]." *Id.* (second alteration in original) (internal quotation marks omitted). "Where there is competent evidence to support the trial court's findings of fact, those findings are binding on appeal." *Burress*, 195 N.C. App. at 449-50, 672 S.E.2d at 734.

N.C.G.S. § 50B-3(a) provides that, if a trial court "finds that an act of domestic violence has occurred, the court shall grant a protective order restraining the defendant from further acts of domestic violence." N.C. Gen. Stat. § 50B-3(a) (2013). Domestic violence is defined as

> the commission of one or more of the following acts upon an aggrieved party or upon a minor child residing with or in the custody of the aggrieved party by a person with whom the aggrieved party has or has had a personal relationship, but does not include acts of self-defense:
>
> (1) Attempting to cause bodily injury, or intentionally causing bodily injury; or
>
> (2) Placing the aggrieved party or a member of the aggrieved party's

family or household in fear of imminent serious bodily injury or continued harassment, as defined in G.S. 14-277.3A, that rises to such a level as to inflict substantial emotional distress; or

(3) Committing any act defined in G.S. 14-27.2 through G.S. 14-27.7[, which are criminal offenses in the "Rape and Other Sex Offenses" Article of the General Statutes].

N.C. Gen. Stat. § 50B-1(a) (2013). Additionally, the term "personal relationship" referenced in this subsection includes a relationship wherein the parties involved are either "current or former spouses" or "related as parents and children." N.C. Gen. Stat. § 50B-1(b).

Defendant first asserts that the trial court's findings of fact are not supported by competent evidence. However, a careful examination of the evidence in the record before us and of defendant's arguments in his brief reveals that there is competent evidence to support the court's findings, and that defendant is merely urging this Court to reweigh the evidence presented to the trial court, and to give greater consideration to his own testimony which is favorable to him. Because it is for the trial court to determine, when sitting as the finder of fact, which reasonable inferences are to be drawn from the evidence when such inferences can be so drawn, *see Brandon*,

132 N.C. App. at 651, 513 S.E.2d at 593, and because findings of fact are binding on appeal where there is competent evidence to support them, *see Burress*, 195 N.C. App. at 449-50, 672 S.E.2d at 734, and since there is ample competent evidence in the record to support the trial court's binding findings of fact, we must decline defendant's entreaty to disturb them.

Defendant next suggests that the acts he committed against Randi were not acts of domestic violence but, instead, acts of parental discipline, and asserts that the court's determination that his acts were "well in excess of ordinary and constitutionally protected discipline, and, in fact, his actions constituted an assault that cause physical injury to Randi" is, in his words, "just wrong." However, it is defendant's burden "to present the arguments and authorities upon which [he] rel[ies]" in support of his position, *see* N.C.R. App. P. 28(a), and "[t]he scope of review on appeal is limited to issues so presented . . . ." *Id.* In his brief, defendant presented no substantive legal argument to support his assertion that choking his daughter twice, chasing her throughout the family residence, and slamming her face against a freezer with such force that it left a bruise, all for the self-professed purpose of "trying to prove a point with and discipline his child," are acts that are "not what was comprehended or envisioned by the enactment of the

Domestic Violence Act as set forth in Chapter 50B." Since issues "in support of which no reason or argument is stated[] will be taken as abandoned," N.C.R. App. P. 28(b)(6); *see also Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 402, 610 S.E.2d 360, 361 (per curiam) ("It is not the role of the appellate courts . . . to create an appeal for an appellant."), *reh'g denied*, 359 N.C. 643, 617 S.E.2d 662 (2005), we decline to consider defendant's unsupported argument further.

Our disposition renders it unnecessary to consider defendant's remaining substantive issue on appeal, as it was not preserved by proper objection at trial. We also decline to address those remaining assertions in support of which defendant has provided no legal argument.

Affirmed.

Judges ELMORE and HUNTER, JR. concur.

Report per Rule 30(e).